922 F.Supp. 1556 (1995)
Davida JOHNSON; Pam Burke; Henry Zittrouer; George L. Deloach; and George Seaton, Plaintiffs,
v.
Zell MILLER, in his official capacity as Governor of the State of Georgia; et al., Defendants.
No. CV 194-008.
United States District Court, S.D. Georgia, Augusta Division.
December 13, 1995.
*1557 *1558 A. Rowland Dye, Dye, Tucker, Everitt, Wheale & Long, Augusta, GA, Larry H. Chesin and A. Lee Parks, Kirwan, Goger, Chesin & Parks, Atlanta, GA, for plaintiffs.
Dennis Robert Dunn, Atlanta, GA, David Frank Walbert, Walbert & Mathis, Atlanta, GA, Sam George Nicholson, Augusta, GA, *1559 and Sewell R. Brumby, Office of Legislative Counsel, Atlanta, GA, for defendants.
Laughlin McDonald, Neil Bradley, Mary Ellen Wyckoff, ACLU, Atlanta, GA, Judybeth Greene, Loretta King, Daniel H. Clayman, Dept. of Justice  Civil Rights Div., and Donna M. Murphy, Dept. of Justice, Civil Rights Division, Voting Section, Washington, DC, for intervenor-defendants.
Doug Teper, Atlanta, GA, amicus pro se.
A. Leon Higginbotham, Jr., New York City, Frank B. Strickland, Anne Ware Lewis, Wilson, Strickland & Benson, Atlanta, GA, Richard Scott Thompson, McNatt, Greene & Thompson, Vidalia, GA, Dalton L. Oldham, Columbia, SC, for amici.
Gray Brumby, Atlanta, GA, amicus pro se.
Sanford D. Bishop, Jr., Member of Congress, Washington, DC, interested party pro se.
Jim Coonan, Atlanta, GA, interested party pro se.
Woodrow Lovett, Sardis, GA, interested party pro se.
Before EDMONDSON, Circuit Judge; EDENFIELD, Chief Judge; and BOWEN, District Judge.

ORDER
This Court's September 12, 1994, Order declared Georgia's Eleventh Congressional District unconstitutional. Johnson v. Miller, 864 F.Supp. 1354 (S.D.Ga.1994) ("Johnson I"). The Supreme Court affirmed our decision in Miller v. Johnson, ___ U.S. ___, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995) ("Johnson II"). In accordance with the Supreme Court's affirmance, we held a hearing on August 22, 1995, to determine the best means of resolving the issue of remedy. Plaintiffs moved for leave to add residents of Georgia's Second Congressional District in a constitutional challenge thereto. The Court granted that motion, held a trial, and declared the Second District unconstitutional. Johnson v. Miller, 922 F.Supp. 1552 (S.D.Ga.1995) ("Johnson III").[1]
As to the remedy, we deferred to Georgia's legislature, allowing it an opportunity to draw a new congressional map in accordance with the Supreme Court's holding and this Court's prior findings. Growe v. Emison, 507 U.S. 25, 113 S.Ct. 1075, 122 L.Ed.2d 388 (1993). Time obviously was of the essence in light of the rapidly approaching 1996 Congressional elections and the more imminent 1996 congressional campaigns. However, the legislature notified the Court on September 13, 1995, that it was unable to redraw the map and had adjourned, effectively leaving the task to us. See "Notice of Def. Murphy with Respect to Legislative Adjournment." We are therefore forced to redraw Georgia's congressional districting plan.

I. Scope of Remedy
In fashioning a remedy in redistricting cases, courts are generally limited to correcting only those unconstitutional aspects of a state's plan. Upham v. Seamon, 456 U.S. 37, 102 S.Ct. 1518, 71 L.Ed.2d 725 (1982). The rationale for such a "minimum change" remedy is the recognition that redistricting is an inherently political task for which federal courts are ill-suited. Id. at 41-42, 102 S.Ct. at 1521-22. A minimum change plan acts as a surrogate for the intent of the state's legislative body. See Id. at 43, 102 S.Ct. at 1522 (district court must reconcile Constitutional requirements with goals of state policy); White v. Weiser, 412 U.S. 783, 795, 93 S.Ct. 2348, 2355, 37 L.Ed.2d 335 (1973) ("district court should ... honor state policies in the context of congressional reapportionment").
In Upham, the Texas legislature had passed a congressional districting plan and submitted it to the U.S. Department of Justice ("DOJ") for preclearance. While the plan was with the DOJ, a case was filed in district court challenging the plan's constitutionality under the Voting Rights Act ("VRA"). The U.S. Attorney General also objected to the plan, specifically objecting to two of the plan's twenty-seven districts. The three judge panel determined that the two districts were unconstitutional, and devised a *1560 plan of its own. The court's plan redrew the two objectionable districts and two adjoining districts. However, in doing so, the Court substituted its own judgment for the Texas legislature's and redrew districts in Dallas County in addition to the two objectionable south Texas districts. Reasoning that the legislatively-drawn districts would have failed retrogression analysis, the court redrew the Dallas County districts under the stricter standard applicable to courts. Thus, the court ignored the legislature's preferences.
Reversing, the Supreme Court held that the district court erred in redrawing the Dallas County districts absent an objection to those by the attorney general or a specific finding that they were unconstitutional. The Court stated that a "district court's modifications of a state plan [should be] limited to those necessary to cure any constitutional or statutory defect." Upham, 456 U.S. at 43, 102 S.Ct. at 1522. And, "`[i]n fashioning a reapportionment plan or in choosing among plans, a district court should not pre-empt the legislative task nor intrude upon state policy any more than necessary.'" Id. at 42, 102 S.Ct. at 1521 (quoting Weiser, 412 U.S. at 794-95, 93 S.Ct. at 2354-55). The Court had no objection to the district court's correction of the two objectionable districts or the two adjoining districts that were necessarily impacted as a result thereof.
At first glance it appears that, in remedying Georgia's constitutionally infirm congressional districting plan, we are faced with the same task as the Upham court, which would entail making only those changes necessary to bring the current plan into constitutional compliance. However, this Court's remedial task differs from that of the Upham court's because Georgia's current plan was not the product of Georgia's legislative will. Rather, the process producing Georgia's current plan was tainted by unconstitutional DOJ interference. See Johnson I, 864 F.Supp. at 1367-68. By virtue of its unconstitutional origin, Georgia's current congressional plan cannot form the basis for the remedy we now construct because it does not represent the goals of Georgia's historic policies nor the state legislature's true intent.

A. Department of Justice's Interference
Central to this Court's finding that the Second and Eleventh Districts are unconstitutional was the DOJ's level of involvement in the creation of the current plan. The DOJ used informants inside the legislature to keep tabs on the legislature's progress. Id. at 1367. It worked closely with the ACLU to help the ACLU achieve its objective of three majority-minority districts in Georgia. Id. at 1362-63 (finding, among other things, that the "DOJ was more accessible and amenable to the opinions of the ACLU than to those of the Attorney General of the State of Georgia"). The DOJ rejected Georgia's first two plans even though they clearly did not violate Section 5 of the Voting Rights Act. Johnson II, ___ U.S. at ___, 115 S.Ct. at 2491, 132 L.Ed.2d at 784. The DOJ basically used the preclearance process to force Georgia to adopt the ACLU redistricting plan and, in the process, subvert its own legislative preferences to those of the DOJ. The product of the process, the unconstitutional plan, more closely reflects the DOJ's and ACLU's intentions than the Georgia General Assembly's. Johnson I, 864 F.Supp. at 1367 (finding the precleared plan "bore all the signs of DOJ's involvement"). Using the current plan as a basis for the remedy would, in effect, validate the DOJ's constitutionally objectionable actions. Thus, we cannot use Georgia's current plan as a surrogate for the legislature's reapportionment policies and goals. See Johnson II, at ___, 115 S.Ct. at 2481, 132 L.Ed.2d at 782 ("Georgia's ... redistricting plan cannot be upheld unless it satisfies strict scrutiny," which the Court found it did not) (emphasis added); Johnson I, 864 F.Supp. at 1393 (finding "[i]n sum, the current districting plan is not reasonably necessary to comply with Sections 2 or 5 of the VRA. Since no compelling state interest other than VRA compliance is evident, the plan fails strict scrutiny under the Fourteenth Amendment") (emphasis added).
Because the current plan does not represent the Georgia legislature's intent, we are not bound by Upham to make only minimal changes to the current plan in fashioning a *1561 remedy.[2] Finally, since two of Georgia's districts are unconstitutional, are on opposite sides of the state, and contain all or parts of nearly a third of Georgia's counties, any remedy even minimally disruptive to the current plan would necessarily have resulted in drastic changes.[3] Considering the objective that each congressional district should ideally contain 588,929 persons, it is a virtual impossibility to change less than we have.

B. Remedy
Because we are unable to use Georgia's current plan as the basis for a remedy, we were compelled to devise our own plan. The remedy we devised and now order into effect is attached to this order as Appendix A, with the verbal census block description attached as Appendix B. The plan contains one majority-minority district, has an overall population deviation of .35%, and an average deviation of .11%. The plan and how we devised it we further explain below.

II. Remedial Factors
Since the Court is not limited to Georgia's current unconstitutional plan, the Court's task is akin to those cases in which states had no plans. Thus, when devising the remedy, the Court was bound by the stricter guidelines applicable to court plans. These guidelines include the one person-one vote requirement and the state's traditional districting principles.

A. One Person, One Vote
The Equal Protection clause of the Constitution requires "no less than substantially equal ... representation for all citizens, of all places as well as of all races." Reynolds v. Sims, 377 U.S. 533, 568, 84 S.Ct. 1362, 1385, 12 L.Ed.2d 506 (1964). In adhering to this principle of one person-one vote, the Supreme Court has allowed legislatures only the narrowest of margins in population deviations when drawing congressional districts. See Wesberry v. Sanders, 376 U.S. 1, 7-8, 84 S.Ct. 526, 530, 11 L.Ed.2d 481 (1964) (requiring congressional districts to be "as nearly as is practicable" to one person-one vote); Karcher v. Daggett, 462 U.S. 725, 732-33, 103 S.Ct. 2653, 2659, 77 L.Ed.2d 133 (1983) ("absolute population equality [is] the paramount objective" in congressional apportionment). Since federal courts are held to stricter standards than legislatures in redistricting, Wise v. Lipscomb, 437 U.S. 535, 540, 98 S.Ct. 2493, 2497, 57 L.Ed.2d 411 (1978), we were particularly constrained to create a remedy with the lowest population deviation practicable.
Our remedy's population deviation is not perfect. The Supreme Court's mandate that courts follow a state's historical legislative districting principles sometimes conflicts with the one person-one vote requirement. Where such tensions existed, we sought to defer to one person-one vote without decimating the historical character of Georgia's congressional plans. The resultant remedy contains a lower deviation than the current Georgia plan, the 1982 plan, and any other plan presented to the Court which was not otherwise constitutionally defective.[4] Nevertheless, there is some deviation resulting from our adherence to Georgia's traditional districting principles and unique factors, some of which we pause to reconcile here, the remainder of which we discuss in Part II(B) infra.
Georgia's strong historical preference for not splitting counties outside of the metropolitan Atlanta area, as well as other unique factors, account for some of our plan's deviation. See Connor v. Finch, 431 U.S. 407, 419-20, 97 S.Ct. 1828, 1836-37, 52 L.Ed.2d 465 (1977) (in court plan reapportioning state legislature, court is required to enunciate *1562 historically significant state policy or unique features that result in deviation from ideal district size); Weiser, 412 U.S. at 795, 93 S.Ct. at 2354-55 (1973) ("District Court should ... honor state policies in the context of congressional reapportionment").
Georgia has preferred to split counties only in the Atlanta area where division was necessary because of Atlanta's dense population relative to other areas of the state. We did rearrange precincts in the Atlanta area for purposes of achieving better deviations.[5] Of course, we attempted to avoid splitting voting precincts (with the exception of Cobb and Clayton Counties)[6] due to Georgia's preference against that practice.[7] The unconstitutional plan splits twenty-eight precincts in the Second District alone (seventy overall), all predominantly for racial reasons. Johnson III, at 1554. The product of the Court's efforts is a lower overall deviation than Georgia's 1982 and 1992 plans.
However, maintaining political subdivisions (counties) cannot alone justify less than perfect deviation in a court plan. Cf. Karcher, 462 U.S. at 740, 103 S.Ct. at 2663 ("we are willing to defer to state legislative policies, so long as they are consistent with constitutional norms, even if they require small differences in the population of congressional districts"); Weiser, 412 U.S. 783, 93 S.Ct. 2348, 37 L.Ed.2d 335 (1973) (mandating strict adherence to legislative policies). We therefore considered splitting counties outside of the Atlanta area, but other factors unique to Georgia militated against it.
Other factors causing the slight deviation include maintenance of core districts and communities of interest. Georgia has historically preferred to maintain the core of each district during reapportionment. Cf. 1972 Plan, Def.Exh. 14, and 1982 Plan, Pl.Exh. 41, Def.Exh. 15. Our remedy maintains ninety-five counties (totally or partially) in the same districts as they were located in the 1982 plan  significant given the addition of the Eleventh District, which in the remedy contains thirteen counties.
Maintaining county boundaries also helps to ensure that communities of interest are maintained within the same district. Residents of a particular county are similarly affected by the decisions of their elected representatives. People who share communities of interest logically belong within the same congressional district. See Johnson II, at ___, 115 S.Ct. at 2481, 132 L.Ed.2d at 782 *1563 (discussing significance of communities of interest).
Incidentally, a factor unique to Georgia, and one which enables a draftsman to reach near perfect deviations without splitting counties, is the number of Georgia counties: 159. Most of the counties are more sparsely populated than the Atlanta area counties. With such a high number of counties, we were able to achieve extremely low deviations without splitting non-Atlanta area counties. Cf. Mahan v. Howell, 410 U.S. 315, 321, 93 S.Ct. 979, 983-84, 35 L.Ed.2d 320 (1973) (allowing states to "use political subdivision lines to a greater extent in establishing state legislative districts" because of the greater number of state legislative districts to be apportioned as compared to the lesser number of congressional districts), modified 411 U.S. 922, 93 S.Ct. 1475, 36 L.Ed.2d 316 (1973).[8] As we have noted:
With the exception of Texas, Georgia has more counties than any other state in the Union; one would think that such a proliferation would provide ample building blocks for acceptable voting districts without chopping any of those blocks in half.
Johnson I, 864 F.Supp. at 1377.
In the calculus of district population deviation, our only measure of the state's demographics is the decennial census. Since the population is not static, we adhered to the fiction that the census block figures are accurate to the exclusion of all others. In 1995, no precise count of a district's population can be made using 1990 data. We are halfway through the decade. Changes have occurred in Georgia. See, e.g., footnote 17, infra. In sum, using the available data and whole counties outside of the Atlanta area, our remedy is probably as close to "zero deviation" as one can be. At this point in the decade, the deviation effort is largely theoretical. The real data, known only to providence, would doubtlessly lead us to another result.
Yet, we remain sensitive to the extant deviation, so we now explain the other factors we were compelled to consider.

B. Adherence to Georgia's Historic Districting Preferences

1. Source of Georgia Legislature's Intentions
Since redistricting is an inherently political process, federal courts undertaking the task must adhere to the state's historical districting preferences and traditions. Upham, 456 U.S. at 39, 102 S.Ct. at 1520; Weiser, 412 U.S. at 795, 93 S.Ct. at 2354-55. The problem facing the Court was that, unlike the situation in Upham, Georgia's current plan does not represent the political will of Georgia's citizens. See Part I, supra. The issue then became where we should look to divine Georgia's true political will. Given the unique events of Georgia's 1992 redistricting process, the Court has a better understanding of what the legislature might have done had it not been for the DOJ's subversion of the redistricting process.
We drew upon Georgia's 1972 plan and 1982 plan, as well as the first plan enacted in 1992,[9] to determine how the legislature typically maintains district cores from one plan to another. Our first hurdle was where to locate the new Eleventh District. Since significant population growth is occurring in the Atlanta area, it follows that the new district would be created where future growth is anticipated. Carving the new district where growth is projected allowed us to include fewer counties within the district, consequently enabling us to better maintain district cores.
We placed the new Eleventh District in the Northeast Atlanta corridor out to the northeast Georgia state line. The Eleventh district now contains counties which are becoming more urban with the population growth, notably Walton County and Newton County. *1564 Eleventh Trl.Trans. III at 26. The Eleventh also contains the Athens-Clarke County area which has become a metropolitan area in its own right, and locating it in the Eleventh is consistent with the new Eleventh's urban/suburban flavor. Id.
The resulting Eleventh District is a relatively compact grouping of counties which follow a suburban to rural progression and have Interstate Eighty-Five as a very real connecting cable. The road net, the area's commerce, its recreational aspect, and other features produce a district with a palpable community of interests. As a "radius" district reaching from suburban Atlanta to the state line, the new Eleventh has an analogous resemblance to the Third, Seventh, and Ninth Districts.
Georgia's Tenth District has historically been located in the east-central portion of the state, with Augusta as its main hub. Eleventh Trl.Trans. III at 26; 1940 Plan, Jt. Exh. 16; 1972 plan. Addition of the Eleventh precipitated a shift in the Tenth District south, but the Tenth retains Augusta as its main hub and retains its primarily rural character. The Court began here, and the remainder of the remedy fell into place along the lines of Georgia's historic plans, maintaining district cores where possible.

2. Georgia's Traditional Districting Factors
While Georgia's legislature considers many factors in the apportionment process, there are a few factors that have historically guided the legislature in the process more so than others and which are evident in the plans it has historically enacted.[10] These factors, all of which have heavily influenced past apportionment plans in Georgia, are the primary factors that guided our development of this remedy. We explore some of them below, and we note that consideration of them was tempered by the one person-one vote principle.

a. Maintaining Political Subdivisions
The Georgia General Assembly has strongly adhered to the principle of maintaining counties within the same congressional district. Georgia did not split a county until 1972, when it was necessary to do so because of the dense population in the metropolitan Atlanta area. See 1972 Map. The 1982 plan only split three counties, again in the Atlanta area for population density reasons.[11] Eleventh Trl.Trans. III at 36. Likewise, our remedy splits only six counties, all within the Atlanta area, and all split for population density reasons.[12] In comparison, the current unconstitutional plan split twenty-three counties, seventeen of which were split for no reason other than race.
Maintaining Dekalb County entirely within one district was a feature of several plans submitted to the Court. However, we chose to split Dekalb, removing a few voting precincts from the Fourth District and placing them in the Fifth District in order to achieve near perfect deviations in those Districts.[13] The other reasons for doing this were: 1) the Georgia legislature has already made the political decision to split Dekalb for population density reasons, first in 1982, and again in each of the three plans presented to the DOJ for preclearance in 1992; 2) the result was an increase in the Fifth District's minority voting age population from fifty-three percent to fifty-seven percent, an increase most *1565 likely required by the VRA;[14] and 3) the City of Atlanta, a significant political subdivision in its own right, is encompassed completely by the Fifth District.

b. Four "Corner Districts"
Georgia historically has maintained four "corner districts" in its Congressional plans. Eleventh Trl.Trans. III at 23-27. The four "corner" districts include: 1) the southeastern coastal district, comprising the coastal counties and the other counties most closely related to them; 2) an agrarian district in southwest Georgia, prominent for its peanut production; 3) the northwestern corner, known for its carpet production and isolated from the northeast Georgia counties by mountains; and 4) the northeastern corner, identified by its preeminent position in poultry production. Maintaining these districts is consistent with the community of interest factor approved by the Supreme Court. Johnson II, at ___, 115 S.Ct. at 2481, 132 L.Ed.2d at 782. Our remedy adheres to all of these objectives with the exception of the northeast corner district, a necessary consequence of adding an eleventh district and the shift in counties that it precipitated.

c. Urban Minority District
In 1972 Georgia created an urban minority district in the Atlanta area to comply with the VRA. This is Georgia's sole majority-minority congressional district. Recognition of the Fifth District as an urban minority district resulted from voting rights litigation in the early seventies. Eleventh Trl.Trans. III at 27. Since race is a factor this Court can consider, we considered it insofar as the legislature would have considered it in maintaining one majority-minority district or else run afoul of VRA Sections 2 and 5.
Unlike the unconstitutional Eleventh District, Fifth District residents have a strong community of interest, and the geography of the district itself is compact and meets contiguity requirements. See Jt.Exh. 15; Jt.Exh. 1; Remedy, Appendix A. Also, Section 2 of the VRA required the Court to maintain the Fifth District as a majority-minority district. See Part II(B)(2)(f)(1), infra.

d. Maintaining District Cores
Georgia's legislature has historically sought to maintain district cores from one plan to another. The 1972, 1982, and the three 1992 plans that passed the legislature evidence this legislative preference. Our remedy bears a striking resemblance to these earlier plans, especially in the rural districts such as the First, Second, Eighth, and Ninth. See Part II(A), supra (noting that the remedy maintains ninety-five counties in the same districts as they were located in the 1982 plan, and the new Eleventh District contains thirteen of the remaining counties).

e. Protecting Incumbents
Georgia has historically sought to draw district lines so incumbents remain in their districts in a new plan and to avoid placing two incumbents in the same district. The Court considered this factor, but since it is inherently more political than factors such as communities of interest and compactness, we subordinated it to the other considerations. We note, however, that our remedy places incumbents in the same district in only two districts, while keeping eight incumbents in their present districts. The remedy's Eighth and Eleventh Districts do not currently have incumbents as residents. The incumbent from the former Eighth District resides in the remedy's Second District, and the Eleventh District incumbent resides in the remedy's Fourth District.

f. Voting Rights Act

1) Section 2
Section 2 of the Voting Rights Act, 42 U.S.C. § 1973, applies to any "voting qualification or prerequisite to voting or standard, practice, or procedure ... imposed or applied by any State or political subdivision...." 42 U.S.C. § 1973(a). A plain reading of the statute would lead one to believe that Section 2 does not apply to a court-drawn and ordered redistricting plan. *1566 See Holder v. Hall, ___ U.S. ___, 114 S.Ct. 2581, 129 L.Ed.2d 687 (1994) (Thomas, J. Dissenting). However, Section 2 does apply to certain cases in which a federal court orders a redistricting plan into effect. See United States v. Dallas Cnty. Comm'n, 850 F.2d 1433 (11th Cir.1988) (holding that any proposed remedy for a Section 2 violation must meet Section 2 requirements), cert. denied, 490 U.S. 1030, 109 S.Ct. 1768, 104 L.Ed.2d 203 (1989).
During the remedy phase of the hearing, a significant portion of the argument centered on whether the Court's remedy would be required by Section 2 to contain two majority-minority districts. We have considered Section 2 and the case law construing it, and we conclude that two majority-minority districts are not required by Section 2 because including two such districts would violate Johnson II's principles.

i) When Section 2 Requires Creation of a Majority-Minority District
States run afoul of Section 2 when they draw district lines which have the "effect of denying a protected class the equal opportunity to elect its candidate of choice." Voinovich v. Quilter, 507 U.S. 146, 147, 113 S.Ct. 1149, 1152, 122 L.Ed.2d 500, 512 (1993) (emphasis in original). Section 2 mandates that courts look at the totality of the circumstances when determining whether a violation exists. 42 U.S.C. § 1973(b). Plaintiffs establish a Section 2 violation by proving three factors, as first stated in Thornburg v. Gingles, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986): (1) that the minority group "`is sufficiently large and geographically compact to constitute a majority in a single-member district;' ... (2) that the minority group "`is politically cohesive; ... [and] (3) that the white majority votes sufficiently as a bloc to enable it ... usually to defeat the minority's preferred candidate.'" Voinovich, at 157, 113 S.Ct. at 1157, 122 L.Ed.2d at 513-14 (quoting Growe, at 37-38, 113 S.Ct. at 1083, 122 L.Ed.2d at 403). However, these factors are not to be applied mechanically, Johnson v. DeGrandy, ___ U.S. ___, ___, 114 S.Ct. 2647, 2655, 129 L.Ed.2d 775 (1994); Voinovich, at 157, 113 S.Ct. at 1157, 122 L.Ed.2d at 514, and while they are the preconditions a plaintiff must first establish to prove a Section 2 violation, they must be considered along with other factors when analyzing a Section 2 claim. DeGrandy, at ___, 114 S.Ct. at 2657.

ii) Why Section 2 Does Not Require a Second Majority-Minority District in Georgia
Ample evidence has been presented during the two trials to enable the Court to determine that Section 2 does not require creation of a second majority-minority district in Georgia  due primarily to the geographic dispersion of its minority population and lack of any significant vote polarization. Creating a second majority-minority district would also violate the Supreme Court mandate under which we now operate because Johnson II held that the VRA cannot be applied to reach an unconstitutional result.
Analysis of a racial map of Georgia reveals that the state's minority population is widely dispersed.[15] In fashioning a remedy, we considered the possibility of creating a second majority-minority district and concluded that to do so would require us to subordinate Georgia's traditional districting policies and consider race predominantly, to the exclusion of both constitutional norms and common sense. Such a plan would directly contravene the Supreme Court's holding in Johnson II  that race cannot predominate in the redistricting context absent a compelling justification for it. ___ U.S. at ___, 115 S.Ct. *1567 at 2481, 132 L.Ed.2d at 782. Nonracial factors do not support creation of a second majority-minority district largely because Georgia's minority population is not geographically compact. DeGrandy, at ___, 114 S.Ct. at 2655. Creating a second majority-minority district would require this Court to engage in the unconstitutional racial gerrymandering characteristic of the plan we now replace. Georgians deserve a better fate. "It takes a shortsighted and unauthorized view of the Voting Rights Act to invoke that statute ... to demand the very racial stereotyping the Fourteenth Amendment forbids." Johnson II, at ___, 115 S.Ct. at 2494, 132 L.Ed.2d at 787.[16]
Statistical evidence pertaining to statewide voting patterns in Georgia showed a significant degree of crossover voting. Johnson I, 864 F.Supp. at 1390. We observed that "[b]lack and black-preferred candidates in Georgia have achieved many electoral victories in local and statewide elections and have received significant  occasionally overwhelming  support from both black and white voters within the Eleventh Congressional District." Id. at 1390-91. During the Second District trial, Linda Meggers stated that election results in that district indicated white crossover voting. Second Trl.Trans. at 438. Indeed, Congressman Sanford Bishop, the black Congressman currently representing the Second District, agreed. Id. at 142. There is conflicting evidence on the degree of vote polarization in Georgia. This much is clear: while some degree of vote polarization exists, it is "not in alarming quantities." Johnson I, 864 F.Supp. at 1390. The second and third Gingles preconditions therefore would not be met in a Section 2 challenge to the remedy. Thus, the remedy we now impose meets the requirements of Section 2 without containing two majority-minority districts.
We note that several districts in the remedy do contain significant minority populations which could influence election results. The 1982 plan contained five districts with a minority population of greater than twenty-five percent, and three with a minority population of greater than thirty-five percent. Our remedy contains six districts with a minority voting age population of greater than twenty-five percent, and two districts, the Fifth and the Second, with a minority voting age population of greater than thirty-five percent, *1568 while the remedy's Tenth comes close to that with a minority voting age population of more than thirty-four percent. The remedy's minority percentages per district are comparable to those in the 1982 plan, even with the addition of the Eleventh District.
While we were required to use the 1990 census numbers in formulating the remedy, we note the demographic trend indicating that Dekalb County's population, which comprises the majority of the remedy's Fourth District, is becoming more heavily minority. This means that the Fourth District has the potential to become a very strong minority influence district or a majority-minority district as Georgia is reapportioned following future censuses, if it is not already.[17]

iii) What Section 2 Does Require
While Section 2 does not require the Court to create a second majority-minority district, it does require maintenance of the Fifth District as a majority-minority district. The minority population in the Fifth District is sufficiently compact and, being an urban minority population, has a sufficiently strong community of interest to warrant being a majority-minority district. Compliance with the VRA required creating the Fifth as majority-minority in 1972. Eleventh Trl.Trans. III at 27. As a result of 1982 litigation, the Fifth District was required to have a minority population of sixty-five percent. Busbee v. Smith, 549 F.Supp. 494 (D.D.C.1982), aff'd, 459 U.S. 1166, 103 S.Ct. 809, 74 L.Ed.2d 1010 (1983).
The minority population of sixty-one percent, minority voting age population of fifty-seven percent, and a black registered voter percentage of fifty-four percent in the remedy's Fifth District does not result in a dilution of the rights of that district's minorities. Dr. Katz, the most credible statistical expert at the first trial, identified a "significant majority" minority district as one having fifty-five to sixty percent of black registered voters. See Katz Rep. at 22. We endeavored to maintain the black percentage of registered voters in the Fifth District as close to fifty-five percent as possible. Expert testimony at the Eleventh District trial indicated a significant drop in the probability of a black candidate being elected as the black percentage of registered voters declines to fifty percent. Katz Rep. at tab 5. The probability of electing a black candidate is below fifty percent when the percentage of black registered voters equals fifty percent. Id. Therefore, maintaining the percentage of black registered voters as close to fifty-five percent as possible was necessary, in our view, to avoid dilution of the Fifth District minorities' rights.[18]
The minority population of the Fifth District in the 1982 plan was sixty-five percent in order for Georgia to comply with the VRA. Busbee supra. We felt that allowing the minority population to fall below sixty percent might be viewed as dilutive at some level. The minority population in the remedy's Fifth District is just shy of sixty-two percent.[19]

*1569 2) Section 5
VRA Section 5 requires certain states which have a history of discriminating against minorities to seek preclearance from the U.S. Attorney General prior to implementing a new districting or apportionment plan. 42 U.S.C. § 1973c. However, "[a] decree of the United States District Court is not within reach of Section 5 of the Voting Rights Act." Connor v. Johnson, 402 U.S. 690, 691, 91 S.Ct. 1760, 1762, 29 L.Ed.2d 268 (1971); McDaniel v. Sanchez, 452 U.S. 130, 138, 101 S.Ct. 2224, 2230, 68 L.Ed.2d 724 (1981). Thus, this Court is not required to seek the preclearance of the Attorney General prior to implementing its plan. The Court does note that its remedy is not retrogressive to the rights of minorities when compared to the 1982 plan,[20] and it does not violate Section 5 for the same primary reasons that it does not violate Section 2.
Connor notwithstanding, some court-ordered plans have been subject to Section 5 and its requirements. In Sanchez, the Supreme Court held that Section 5's preclearance requirement did apply to a reapportionment plan submitted to a federal court by the legislative body of a jurisdiction covered by Section 5. 452 U.S. at 153, 101 S.Ct. at 2238.
It could be argued that the Court's remedy is a legislative plan since it resembles some of the legislative plans, including the unconstitutional one. To varying extents we relied upon the three enacted 1992 plans, as well as the 1972 and 1982 plans, to determine how the legislature maintains district cores and communities of interest, so some similarity to those plans is inevitable.
However, the Court's plan is its own. While it may resemble one or more of several plans presented to us, as a member of this Court observed during the remedy phase of the hearings: "There could come a time when even the fertility of Herschel the [reapportionment] computer is exhausted and we have received a finite number of maps.... If we extend that logic we are going to be rubber stamping somebody's plan, but I suspect that what we'll do will be our own unique product." Second Trl.Trans. at 409.
So the remedy we now order is not the product of Georgia's legislature. We of course would have preferred for the legislature to have fulfilled its obligation and formulated a districting plan for Georgia. Alas, none was presented to us.[21] We therefore have formulated our remedy in adherence to constitutional norms and deference to the legislature's historical preferences. Therefore, it is not subject to preclearance under VRA Section 5.

III. Conclusion
The Court has fashioned a plan to remedy Georgia's current, unconstitutional districting plan. In arriving at this remedy, we adhered as closely as possible to the Supreme Court's mandate in Johnson II, the principle of one person-one vote, and Georgia's traditional legislative goals and traditions. Adopting a remedy that would be truly minimally disruptive to Georgia's current plan was not an option. No plan of congressional redistricting created by court or legislature will achieve perfection. There are too many practical, political, and altogether human features in the equation. We do no harm with this plan, which cures the unconstitutionality of the former and can serve in "caretaker" status until the legislature convenes to change it. That may occur following the millennium census, or before.
Noting again the reluctance with which the task was undertaken, it is hereby ORDERED and DECREED that henceforth all elections for the members of the House of Representatives of the Congress of the United States from the State of Georgia shall be conducted in accordance with the plan which *1570 is appended hereto as Appendices "A" and "B".
SO ORDERED.
EDMONDSON, Circuit Judge, dissents.

APPENDIX A[*]

*1571 

 (NOTE: VAP = Voting Age Population)
 Total Pop Black Pop VAP Black VAP
 District
 Number % Deviation % of Total % of Total % of VAP
 ======================== ======================
 1 588541 179809 426558 118631
 -0.07 30.55 72.48 27.81
 2 587583 230419 415407 145948
 -0.23 39.21 70.70 35.13
 3 589630 145377 424974 95713
 0.12 24.66 72.07 22.52
 4 589322 215700 450500 147784
 0.07 36.60 76.44 32.80
 5 589359 365330 442885 253212
 0.07 61.99 75.15 57.17

*1572
 6 589600 37597 440475 27122
 0.11 6.38 74.71 6.16
 7 589405 77871 432683 51911
 0.08 13.21 73.41 12.00
 8 587912 182636 425122 120107
 -0.17 31.07 72.31 28.25
 9 589420 21520 439083 15164
 0.08 3.65 74.49 3.45
 10 588046 220803 423299 145950
 -0.15 37.55 71.98 34.48
 11 589398 69503 429927 46600
 0.08 11.79 72.94 10.84
 ======================= =====================
 Totals 6478216 1746565 4750913 1168142
 Number of Districts : 11
 Members Per District : 1
 Ideal District Size : 588929
 Average Deviation (%) : 0.11
 Deviation Range (%) : -0.23 to 0.12
 Overall Deviation (%) : 0.35
( DATA SOURCE: 1990 U.S. Census PL94  171 Population Counts )
( NOTE: Districts numbered > 200 are used as special accumulators. )
( They are not included in avg or % range calculations. )

APPENDIX B

 Operator: fedcourt Client: fedcourt Plan: Congress
___________________________________________________________________________________
District No. 1
__________________
BRANTLEY
BRYAN
BULLOCH
CAMDEN
CANDLER
CHATHAM
EFFINGHAM
EVANS
GLYNN
JENKINS
LIBERTY
LONG
MCINTOSH
PIERCE
SCREVEN
TATTNALL
TOOMBS
WAYNE
District No. 2
__________________
BAKER
BROOKS
CALHOUN

*1573
 Operator: fedcourt Client: fedcourt Plan: Congress
___________________________________________________________________________________
CHATTAHOOCHEE
CLAY
COLQUITT
COOK
CRISP
DECATUR
DOUGHERTY
EARLY
GRADY
LEE
LOWNDES
MACON
MARION
MILLER
MITCHELL
QUITMAN
RANDOLPH
SCHLEY
SEMINOLE
STEWART
SUMTER
TAYLOR
TERRELL
THOMAS
TIFT
TURNER
WEBSTER
WORTH
District No. 3
__________________
CLAYTON
 Tract:0402.
 Block: 908A, 908B
 That part of Block 909 which lies north of the Georgia Power Transmission Line
 Block: 910, 911, 912, 921, 923
 Tract:0403.01
 Block: 103, 107, 108, 117, 118, 119
 Block Group:2
 Block: 301, 515, 517
 Tract:0403.02
 Block: 106, 107, 108, 109A, 109B
 Block Group:2
 Block Group:3
 Block Group:4
 Block: 501, 502, 503, 504, 506, 507, 509, 510, 511, 517A, 518, 519A, 519B, 519C, 519D,
 520, 521, 522, 523A, 523B, 524, 525, 526A, 526B, 527A, 527B
 Tract:0403.03
 Tract:0403.04
 Tract:0403.05
 Tract:0404.01
 Tract:0404.02
 Tract:0404.03
 Tract:0404.05
 Block: 101, 102, 103, 104, 105,
 That part or Blocks 106 and 107 which lies north of the Georgia Power Transmission
 Line
 Block: 109, 110, 119A, 119B, 120, 121, 122, 123, 124, 126, 127, 128, 129, 308, 309
 Tract:0404.06
 Block Group:1
 Block: 201, 202,
 That part of Block 203 which lies east of East Creek
 Block: 218, 219, 220, 234, 235, 236, 237, 901, 902A, 902B, 904, 905, 906, 907A, 907B,
 908, 909, 914, 915, 916, 917, 918, 923, 924, 925A, 925B, 929, 931, 933

*1574
 Operator: fedcourt Client: fedcourt Plan: Congress
____________________________________________________________________________________
 Tract:0405.07
 Tract:0405.08
 Tract:0406.03
 Tract:0406.04
 Tract:0406.05
 Tract:0406.06
 Tract:0406.07
 Tract:0406.08
COWETA
FAYETTE
HARRIS
HENRY
MERIWETHER
MUSCOGEE
PIKE
SPALDING
TALBOT
District No. 4
__________________
DEKALB
 Tract:0202.
 Block: 123B
 Tract:0208.
 Block: 101B
 Tract:0211.
 Tract:0212.02
 Tract:0212.04
 Tract:0212.05
 Tract:0212.07
 Tract:0212.08
 Tract:0212.09
 Tract:0212.10
 Tract:0212.11
 Tract:0212.12
 Tract:0213.01
 Tract:0213.02
 Tract:0213.03
 Tract:0213.04
 Tract:0214.01
 Tract:0214.02
 Tract:0214.03
 Tract:0214.04
 Tract:0215.
 Tract:0216.01
 Tract:0216.02
 Tract:0216.03
 Tract:0217.02
 Tract:0217.03
 Tract:0217.04
 Tract:0218.05
 Tract:0218.06
 Tract:0218.08
 Tract:0218.09
 Tract:0218.10
 Tract:0218.98
 Tract:0219.02
 Tract:0219.03
 Tract:0219.04
 Tract:0219.05
 Tract:0220.01
 Tract:0220.02
 Tract:0220.04
 Tract:0220.05
 Tract:0221.
 Tract:0222.
 Tract:0223.01

*1575
 Operator: fedcourt Client: fedcourt Plan: Congress
____________________________________________________________________________________
 Tract:0223.02
 Tract:0224.01
 Block Group:1
 Block Group:2
 Block: 301, 302B, 303, 304, 305, 306, 307, 308, 309, 310, 311
 Block Group:4
 Tract:0224.02
 Tract:0224.03
 Tract:0225.
 Block Group:1
 Block Group:2
 Block Group:3
 Block Group:4
 Block Group:5
 Block: 601, 602, 603, 604, 605, 606, 607, 608, 609, 610, 611, 612A, 612B, 614
 Block Group:7
 Tract:0226.
 Tract:0227.
 Tract:0228.
 Tract:0229.
 Tract:0230.
 Tract:0231.01
 Tract:0231.02
 Tract:0231.03
 Tract:0231.05
 Tract:0231.06
 Tract:0232.03
 Tract:0232.04
 Tract:0232.05
 Tract:0232.06
 Tract:0232.07
 Tract:0233.02
 Tract:0233.03
 Tract:0233.05
 Tract:0233.06
 Tract:0233.07
 Tract:0233.08
 Tract:0234.03
 Tract:0234.04
 Tract:0234.05
 Tract:0234.07
 Tract:0234.08
 Tract:0234.09
 Tract:0235.01
 Tract:0235.02
 Tract:0235.03
 Tract:0236.
 Tract:0237.
 Tract:0238.01
 Tract.0238.02
 Tract:0238.03
 Tract:0239.98
GWINNETT
 Tract:0503.04
 Tract:0503.05
 Block Group:1
 Block Group:2
 Block Group:3
 Block Group:4
 Block Group:7
 Block: 903
 Tract:0503.06
 Tract:0503.08
 Block: 101, 403
 Tract:0503.09

*1576
 Operator: fedcourt Client: fedcourt Plan: Congress
____________________________________________________________________________________
 Tract:0503.10
 Block: 401, 402, 411A, 411B
 Tract:0503.11
 Tract:0503.12
 Tract:0503.13
 Tract:0503.14
 Tract:0504.03
 Block: 201, 203, 204, 205, 206, 207, 208, 209, 210, 211
 Tract:0504.06
 Tract:0504.07
 Tract:0504.08
 Tract:0504.09
 Block Group:2
 Block Group:3
 Block Group:4
 Block Group:5
 Block Group:6
 Block Group:7
 Tract:0504.10
 Block: 401
 Tract:0504.11
 Block: 406
 Tract:0508.98
District No. 5
__________________
CLAYTON
 Tract:0401.
 Tract:0402.
 Block Group:1
 Block Group:2
 Block: 901, 902, 903, 904, 905, 906, 907,
 That part of Block 909 which lies south of the Georgia Power Transmission Line
 Block: 913, 914, 915, 916, 917, 918, 919, 920, 922, 933
 Tract:0403.01
 Block: 101, 102, 104, 105, 106, 113, 114, 302, 303, 304F, 305, 306, 307, 308, 309A, 309B,
 310, 311, 312A, 312B, 312C, 313, 314, 315, 316
 Block Group:4
 Block: 501, 502, 503, 504, 505, 506, 507, 508, 509, 510, 511, 512, 513, 514, 516
 Tract:0403.02
 Block: 101A, 101B, 101C, 102, 104, 105, 112, 505, 508A, 508B, 512, 513, 514, 515, 516,
 517B
 Tract:0404.05
 That part of Blocks 106 and 107 which lie south of the Georgia Power Transmission
 Line
 Block: 108
 Block Group:2
 Block: 301, 302, 303, 304, 305, 306, 307
 Tract:0404.06
 That part of Block 203 which lies west of East Creek
 Block: 204, 205, 206, 207, 208, 209, 210, 211, 212, 213, 214, 215, 216, 217, 227, 228, 903
 Tract:0405.03
 Tract:0405.04
 Tract:0405.05
 Tract:0405.06
DEKALB
 Tract:0201.
 Tract:0202.
 Block: 101, 102, 103, 104, 105, 106, 107, 108, 109, 110, 111, 112, 114, 115, 116, 117, 118,
 119, 120, 121, 122, 123A, 124, 126, 127
 Tract:0203.
 Tract:0204.
 Tract:0205.
 Tract:0206.
 Tract:0207.

*1577
 Operator: fedcourt Client: fedcourt Plan: Congress
____________________________________________________________________________________
 Tract:0208.
 Block: 101A, 102, 103, 104, 105, 106, 107, 108, 109, 110
 Block Group:2
 Block Group:3
 Block Group:4
 Block Group:5
 Block Group:6
 Block Group:7
 Tract:0209.
 Tract:0224.01
 Block: 302A
 Tract:0225.
 Block: 613
FULTON
 Tract:0001.
 Tract:0002.
 Tract:0004.
 Tract:0005.
 Tract:0006.
 Tract:0007.
 Tract:0008.
 Tract:0010.95
 Tract:0011.
 Tract:0012.
 Tract:0013.
 Tract:0014.
 Tract:0015.
 Tract:0016.
 Tract:0017.
 Tract:0018.
 Tract:0019.
 Tract:0020.
 Tract:0021.
 Tract:0022.
 Tract:0023.
 Tract:0024.
 Tract:0025.
 Tract:0026.
 Tract:0027.
 Tract:0028.
 Tract:0029.
 Tract:0030.
 Tract:0031.
 Tract:0032.
 Tract:0033.
 Tract:0035.
 Tract:0036.
 Tract:0037.
 Tract:0038.
 Tract:0039.
 Tract:0040.
 Tract:0041.
 Tract:0042.95
 Tract:0043.
 Tract:0044.
 Tract:0046.95
 Tract:0048.
 Tract:0049.95
 Tract:0050.
 Tract:0052.
 Tract:0053.
 Tract:0055.01
 Tract:0055.02
 Tract:0056.
 Tract:0057.

*1578
 Operator: fedcourt Client: fedcourt Plan: Congress
____________________________________________________________________________________
 Tract:0058.
 Tract:0060.
 Tract:0061.
 Tract:0062.
 Tract:0063.
 Tract:0064.
 Tract:0065.
 Tract:0066.01
 Tract:0066.02
 Tract:0067.
 Tract:0068.01
 Tract:0068.02
 Tract:0069.
 Tract:0070.
 Tract:0071.
 Tract:0072.
 Tract:0073.
 Tract:0074.
 Tract:0075.
 Tract:0076.01
 Tract:0076.02
 Tract:0077.01
 Tract:0077.02
 Tract:0078.02
 Tract:0078.03
 Tract:0078.04
 Tract:0079.
 Tract:0080.
 Tract:0081.01
 Tract:0081.02
 Tract:0082.01
 Tract:0082.02
 Tract:0083.01
 Tract:0083.02
 Tract:0084.
 Tract:0085.
 Tract:0086.01
 Tract:0086.02
 Tract:0087.01
 Tract:0087.02
 Tract:0088.
 Tract:0089.
 Tract:0090.
 Tract:0091.
 Tract:0092.
 Tract:0093.
 Tract:0094.01
 Tract:0094.02
 Tract:0095.
 Tract:0096.
 Tract:0097.
 Tract:0098.
 Block: 101A, 102, 103A, 104, 105, 106, 107A, 107B, 108, 109, 110, 111, 112, 113, 114,
 115, 117, 118
 Block Group:2
 Block Group:3
 Block Group:4
 Tract:0099.
 Tract:0100.
 Tract:0101.01
 Tract:0101.03
 Block Group:1
 Block Group:2
 Block Group:3
 Block Group:4
 Block Group:5
 Block Group:6

*1579
 Operator: fedcourt Client: fedcourt Plan: Congress
____________________________________________________________________________________
 Block Group:7
 Block: 802, 803, 805, 806, 807, 808, 809, 810, 811, 812, 815, 816, 817, 818, 819, 820, 821,
 822
 Tract:0102.01
 Block: 203A, 203B, 205A, 209A, 210A, 211, 212A, 214A, 215A, 301, 302, 305A, 306,
 307A, 308, 315A, 413A, 703A, 706A, 707, 708
 Tract:0103.01
 Tract:0103.02
 Tract:0104.
 Tract:0105.03
 Tract:0105.04
 Tract:0105.05
 Tract 0105.06
 Tract:0106.01
 Tract:0106.02
 Tract:0107.
 Tract:0108.
 Tract:0109.
 Tract:0110.
 Tract:0111.
 Tract:0112.01
 Tract:0112.02
 Tract:0113.01
 Tract:0113.02
District No. 6
__________________
CHEROKEE
 Tract:0907.
 Block: 511
 Tract:0908.
 Block: 123, 124, 125, 126, 127, 128
 Block Group:2
 Block Group:3
 Block Group:4
 Block Group:5
 Block: 601, 602, 603, 604, 610, 611, 701
 Tract:0909.01
 Tract:0909.02
 Tract:0909.03
 Tract:0910.01
 Block: 101A, 101B, 101C, 102A, 102B, 103, 104A, 104B, 104C, 104D, 105, 106A, 106B,
 106C, 107A, 107B, 108, 109A, 109B, 110A, 110B, 110C, 111A, 111B, 112, 113,
 114
 Block Group:2
 Block Group:3
 Tract:0910.02
 Tract:0910.03
 Tract:0911.01
 Tract:0911.03
 Tract:0911.98
 Tract:0912.98
COBB
 Tract:0301.98
 Tract:0302.03
 Tract:0302.04
 Tract:0302.05
 Tract:0302.06
 Tract:0302.07
 Block Group:1
 Block Group:2
 Block Group:5
 Block Group:6
 Block Group:7

*1580
 Operator: fedcourt Client: fedcourt Plan: Congress
____________________________________________________________________________________
 Block: 801A, 801B, 801C, 802A, 802B, 803, 804, 805, 806, 807, 808, 809, 810, 811, 812,
 813, 814, 815, 816, 817, 818, 819, 820, 821, 822, 824, 825, 826
 Block Group:9
 Tract:0303.02
 Tract:0303.07
 Tract:0303.09
 Tract:0303.10
 Tract:0303.11
 Tract:0303.12
 Tract:0303.13
 Tract:0303.14
 Tract:0303.15
 Tract:0303.16
 Tract:0303.17
 Tract:0303.18
 Tract:0303.19
 Tract:0303.20
 Tract:0303.21
 Tract:0304.01
 Tract:0304.02
 Tract:0304.04
 Tract:0304.05
 Tract:0304.06
 Block: 101A, 101B, 101C, 101D, 101E, 101F, 101G, 102A
 Block Group:3
 Block Group:4
 Block Group:5
 Block Group:6
 Block Group:7
 Block Group:8
 Tract:0305.01
 Tract:0305.02
 Block Group:1
 Block Group:2
 Block Group:3
 Block Group:4
 Block: 601A, 601B, 601C, 603, 604, 605, 606, 607A, 607B
 Tract:0305.03
 Tract:0306.
 Block: 506B, 601, 602, 603
 Block Group:7
 Tract:0310.01
 Block: 210, 216C, 216D, 228B, 910C, 910D, 910E, 910L, 911, 912, 925A, 925B, 925C,
 926
 Tract:0310.02
 Block: 120A
 Tract:0310.03
 Block: 110A, 112A, 113A
 Tract:0311.01
 Tract:0311.03
 Tract:0311.05
 Block Group:1
 Block: 605, 606, 607, 608, 609A, 609B, 610, 611, 612, 613, 614, 615, 616, 617, 618, 619,
 622, 623, 627
 Tract:0311.06
 Block: 412
 Tract:0311.07
 Block Group:2
 Block Group:3
 Block: 401A, 401B, 402, 403, 409A, 409B, 409C, 409D, 410, 412, 416A,
 Block: 416B, 417, 418A, 418B, 421A, 421B
 Tract:0311.08
 Block Group:1
 Block Group:2

*1581
 Operator: fedcourt Client: fedcourt Plan: Congress
____________________________________________________________________________________
 Block: 303A, 304, 308, 310A, 310B, 311, 312, 313A, 313B, 313C, 314A, 314B, 315, 316,
 317, 318, 319, 320A, 320B, 321A, 321B, 322
 Block Group:4
 Tract:0311.09
 Tract:0312.02
 Block Group:3
 Block Group:4
 Block Group:5
 Block: 601A, 601B, 601C, 602, 603A, 603B, 604, 605A, 605B, 605C, 606, 607A, 607B,
 608A, 608B, 608C, 608D, 609A, 609B, 610A, 611B, 612A, 612B, 612C, 613A,
 613B, 613C, 613D, 613E, 613F, 650
 Tract:0312.03
 Tract:0312.04
 Tract:0313.01
 Block: 101B, 155B, 155C, 156, 901A, 905A, 905B
 Tract:0313.02
 Block Group:1
 Block Group:2
 Block: 301, 302, 303, 306, 308, 312, 313, 319, 320, 321, 322, 323, 324
 Block Group:4
 Block Group:5
 Block Group:9
 Tract:0313.05
 Block: 201, 202, 203, 204, 205, 206, 207, 208, 209, 210, 211, 212, 215, 216, 217, 218, 219,
 220, 227, 228
 Block Group:9
 Tract:0316.98.
FULTON
 Tract:0098.
 Block: 101B, 103B, 103C
 Tract:0101.03
 Block: 801, 804, 813, 814
 Tract:0101.05
 Tract:0101.06
 Tract:0101.07
 Tract:0101.08
 Tract:0102.01
 Block Group:1
 Block: 201, 202, 203C, 204, 205B, 206, 207, 208, 209B, 210B, 212B, 212C, 213, 214B,
 215B, 303, 304, 305B, 307B, 315B, 401, 402, 403, 404, 405, 406, 407, 408, 409,
 410, 411, 412, 413B
 Block Group:5
 Block Group:6
 Block: 701, 702, 703B, 704, 705, 706B
 Tract:0102.03
 Tract:0102.04
 Tract:0102.05
 Tract:0114.03
 Tract:0114.04
 Tract:0114.05
 Tract:0114.06
 Tract:0114.07
 Tract:0114.08
 Tract:0114.09
 Tract:0114.10
 Tract:0114.11
 Tract:0115.
 Tract:0116.01
 Tract:0116.02
 Tract:0116.03
GWINNETT
 Tract:0501.01
 Block: 510A, 510B, 511, 512A, 512B, 512C, 512D, 512E, 512F, 513, 528A, 528B, 528C,
 528D, 529A, 529B, 529C, 529D, 530A, 530B, 531, 601, 602, 603, 604, 605, 606,
 607, 608A, 608B, 608C, 609, 610

*1582
 Operator: fedcourt Client: fedcourt Plan: Congress
____________________________________________________________________________________
 Tract:0502.02
 Block: 101A, 101B, 101C, 102, 103, 104A, 104B, 104C, 104D, 104E, 105A, 105B, 105C,
 105D, 106A, 106B, 106C, 106D, 106E, 107, 108, 109A, 109B, 109C, 110A, 110B,
 111, 112A, 112B, 113A, 113B, 113C, 113D, 114A, 114B, 115, 116, 117A, 117B,
 117C, 118A, 118B, 119A, 119B, 120A, 120B, 120C, 120D, 121A, 121B, 122A,
 122B, 122C, 123, 124A, 124B, 124C, 125, 126, 127A, 127B, 128, 129, 130, 131,
 134, 135, 136, 137, 138A, 138B, 138C, 139A, 139B, 139C, 140A, 140B, 140C, 141,
 142, 143, 144A, 144B, 145, 146, 147, 148, 149A, 149B, 150A, 150B, 150C, 150D,
 150E, 151A, 151B, 154
 Block Group:2
 Tract:0502.03
 Tract:0502.04
 Tract:0503.05
 Block Group:5
 Block Group:6
 Block Group:8
 Block: 901, 902
 Tract:0503.07
 Tract:0503.08
 Block: 102, 103
 Block Group:2
 Block Group:3
 Block: 401, 402, 404, 405, 406, 407
 Tract:0503.10
 Block Group:1
 Block Group:2
 Block Group:3
 Block: 403, 404, 405, 406, 407, 408, 409, 410
 Tract:0505.02
 Block: 101A, 101B, 101C, 102, 103, 104, 105, 106, 107, 108, 109, 110, 112, 113, 114, 115,
 116, 117, 118, 119, 120, 121, 122, 123, 124, 125, 126, 127, 128, 129, 130, 131, 132,
 133, 134C, 135, 136, 137, 138
 Tract:0505.03
 Block: 116A, 116B, 116C
 That part of Block 117 which lies north of Taylor Road
 Block: 118, 119, 123, 124, 138, 139, 141, 142, 143, 144, 147, 148, 149, 150, 151, 152, 153,
 154, 155, 162, 163, 164, 165, 166, 168, 169, 170, 171, 172, 203, 204, 705A, 206,
 206, 207, 208, 209, 210, 212A, 212B, 212C, 213, 214A, 214B, 215A, 215B, 215C,
 216, 217A, 217B, 217C, 217D, 218, 219A, 219B, 219C, 220A, 220B, 221A, 221B,
 221C, 221D, 222, 225A, 225B
 Tract:0505.08
 Block Group:2
 Tract:0505.09
 Block Group:2
District No. 7
__________________
BARTOW
CARROLL
CHATTOOGA
COBB
 Tract:0302.07
 Block: 823A, 823B
 Tract:0304.06
 Block: 102B
 Tract:0305.02
 Block: 602
 Tract:0306.
 Block Group:1
 Block Group:2
 Block Group:3
 Block Group:4
 Block: 501A, 501B, 501C, 501D, 501E, 502A, 502B, 503, 504, 505, 506A, 604, 605,
 606A, 606B, 606C, 606D, 606E, 607A, 607B, 607C, 608, 609
 Block Group:9
 Tract:0307.
 Tract:0308.

*1583
 Operator: fedcourt Client: fedcourt Plan: Congress
____________________________________________________________________________________
 Tract:0309.01
 Tract:0309.02
 Tract:0309.03
 Tract:0310.01.
 Block Group:1
 Block: 201, 202, 203, 204, 205, 206, 207, 208, 209, 212, 213, 214, 216A, 216B, 217, 218,
 219, 220, 221, 222, 223, 224, 225, 226, 227, 228A, 229, 230, 231, 901, 902, 903,
 904, 905, 906, 907A, 907B, 908A, 908B, 909A, 909B, 910A, 910B, 910F, 910G,
 910H, 910J, 910K, 910M, 910N, 910P, 913, 914, 915A, 915B, 915C, 915D, 916,
 917, 918, 919A, 919B, 920, 921, 922, 923, 924A, 924B, 924C
 Tract:0310.02
 Block: 101, 102, 103, 104, 105, 106, 107, 108, 109, 110, 111, 112, 113, 115, 116, 117, 118,
 119, 120B, 120C, 122, 123, 124
 Block Group:2
 Tract:0310.03
 Block: 102, 103, 104, 105, 107, 108, 109, 110B, 111, 112B, 113B
 Block Group:2
 Block Group:3
 Block Group:4
 Block Group:5
 Block Group:6
 Block Group:7
 Block Group:8
 Tract:0311.05
 Block: 601, 602, 603, 604, 620, 621, 624, 625
 Tract:0311.06
 Block: 401, 402, 403, 404, 405, 406, 407, 408, 409, 410, 411, 413, 414, 415, 416, 417, 418,
 419
 Block Group:5
 Tract:0311.07
 Block: 404, 405, 406, 407, 408, 411, 413, 414, 415, 419, 420, 422
 Tract:0311.08
 Block: 301, 302, 303B, 305, 306, 307, 309
 Tract:0312.02
 Block: 610B, 611A
 Tract:0313.01
 Block: 101A, 102, 103, 104, 105, 106, 107, 108, 109, 110, 111, 112, 113, 114, 115, 116,
 117, 118, 119, 155A
 Block Group:2
 Block Group:3
 Block Group:4
 Block: 901B, 902, 903, 904, 905C, 906, 907, 908, 911, 912, 913
 Tract:0313.02
 Block: 304, 305, 307, 309, 310, 311, 314, 315, 317, 318
 Tract:0313.04
 Tract:0313.05
 Block: 213, 214, 221, 222, 223, 224, 225, 226, 229
 Block Group:3
 Block Group:4
 Block Group:5
 Tract:0314.03
 Tract:0314.04
 Tract:0314.98
 Tract:0315.01
 Tract:0315.02
 Tract:0316.97
DOUGLAS
FLOYD
HARALSON
HEARD
PAULDING
POLK
TROUP

*1584
 Operator: fedcourt Client: fedcourt Plan: Congress
____________________________________________________________________________________
District No. 8
__________________
APPLING
ATKINSON
BACON
BEN HILL
BERRIEN
BIBB
BLECKLEY
CHARLTON
CLINCH
COFFEE
CRAWFORD
DODGE
DOOLY
ECHOLS
HOUSTON
IRWIN
JEFF DAVIS
LAMAR
LANIER
MONROE
MONTGOMERY
PEACH
PULASKI
TELFAIR
TREUTLEN
TWIGGS
UPSON
WARE
WHEELER
WILCOX
District No. 9
__________________
CATOOSA
CHEROKEE
 Tract:0901.
 Tract:0902
 Tract:0903.
 Tract:0904.
 Tract:0905.
 Tract:0906.
 Tract:0907.
 Block Group:1
 Block Group:2
 Block Group:3
 Block Group:4
 Block: 501A, 501B, 502A, 502B, 502C, 503A, 503B, 503C, 503D, 504A, 504B, 504C,
 505, 506, 507, 508, 509, 510
 Block Group:6
 Tract:0908.
 Block: 101, 102, 103, 104, 105, 106, 107, 108, 109, 110, 111, 112, 113, 114, 115, 116, 117,
 118, 119, 120, 121, 122, 605, 606, 607, 608, 609, 702, 703, 704, 705
DADE
DAWSON
FANNIN
FORSYTH
GILMER
GORDON
HABERSHAM
HALL
LUMPKIN
MURRAY
PICKENS
RABUN

*1585
 Operator: fedcourt Client: fedcourt Plan: Congress
____________________________________________________________________________________
STEPHENS
TOWNS
UNION
WALKER
WHITE
WHITFIELD
District No. 10
__________________
BALDWIN
BURKE
BUTTS
COLUMBIA
ELBERT
EMANUEL
GLASCOCK
GREENE
HANCOCK
JASPER
JEFFERSON
JOHNSON
JONES
LAURENS
LINCOLN
MCDUFFIE
OGLETHORPE
PUTNAM
RICHMOND
TALIAFERRO
WARREN
WASHINGTON
WILKES
WILKINSON
District No. 11
__________________
BANKS
BARROW
CLARKE
FRANKLIN
GWINNETT
 Tract:0501.01
 Block Group:1
 Block Group:2
 Block Group:3
 Block Group:4
 Block: 501, 502, 503, 504, 505, 506, 507, 508, 509, 514, 515, 516, 517, 518, 519, 520, 521,
 522, 523, 524, 525, 526, 527, 532, 533, 534, 535A, 535B, 536A, 536B,
 Block Group:7
 Block Group:8
 Tract:0501.02
 Tract:0502.02
 Block: 132, 133, 152A, 152B, 152C, 152D, 152E, 152F, 153A, 153B, 153C, 155, 156, 157
 Tract:0504.03
 Block Group:1
 Block: 202
 Block Group:3
 Block Group:4
 Block Group:5
 Block Group:9
 Tract:0504.09
 Block Group:1
 Tract:0504.10
 Block Group:1
 Block Group:2
 Block Group:3

*1586
 Operator: fedcourt Client: fedcourt Plan: Congress
____________________________________________________________________________________
 Block: 402, 403
 Block Group:5
 Block Group:6
 Block Group:7
 Tract:0504.11
 Block Group:1
 Block Group:2
 Block Group:3
 Block: 401, 402, 403A, 403B, 404A, 404B, 405, 407A, 407B, 408, 409
 Block Group:5
 Block Group:6
 Block Group:7
 Tract:0504.12
 Tract:0504.13
 Tract:0504.14
 Tract:0504.15
 Tract:0504.16
 Tract:0505.02
 Block: 134A, 134B
 Tract:0505.03
 Block: 101, 102, 103, 104, 105, 106, 107, 108, 109, 110, 111, 112, 113, 114, 115
 That part of Block 117 which lies south and east of Taylor Road
 Block: 120, 121, 122, 125, 126, 127, 128, 129, 130, 131, 132, 133, 134, 135, 136, 137, 140,
 145, 146, 156, 157, 158, 159, 160, 161, 167, 191, 192, 193, 211, 223, 224
 Tract:0505.05
 Tract:0505.06
 Tract:0505.07
 Tract:0505.08
 Block Group:1
 Block Group:3
 Block Group:4
 Block Group:5
 Block Group:6
 Block Group:7
 Block Group:8
 Tract:0505.09
 Block Group:1
 Block Group:3
 Block Group:4
 Block Group:5
 Block Group:6
 Tract:0506.01
 Tract:0506.02
 Tract:0507.04
 Tract:0507.05
 Tract:0507.06
 Tract:0507.07
 Tract:0507.08
 Tract:0507.09
 Tract:0507.10
 Tract:0507.11
HART
JACKSON
MADISON
MORGAN
NEWTON
OCONEE
ROCKDALE
WALTON

NOTES
[1] All page references to Johnson III are to the manuscript Order on file with the clerk's office. All references to transcripts from the Eleventh District trial will be "Eleventh Trl. Trans.," and reference to the Second District trial will be "Second Trl. Trans."
[2] This does not mean that we ignored the current plan altogether, only that our consideration of it was tempered by its origins.
[3] The DOJ's demand for three majority-minority districts resulted in land bridges, splitting numerous counties outside of metropolitan Atlanta predominantly for racial reasons, and splitting 70 voting precincts for the same reasons. Johnson I, at 1376; Johnson III, at 6.
[4] The DOJ presented a plan containing a slightly lower overall deviation than the Court's plan. However, its plan split numerous counties outside of the metropolitan Atlanta area, apparently for racial reasons. Whether the DOJ should be involved in this, the map-generation phase of the redistricting process is questionable. Normally, Georgia would originate a plan for DOJ preclearance under VRA Section 5. Regrettably, we are standing in the state's shoes, and our plan is not subject to Section 5 in any event.
[5] The Court was able to achieve such low deviations by placing Talbot County in the Third District, thereby reducing the Second District's deviation to -.23%. This also allowed a transfer of population from the Third District to the under-populated Fifth District. The Fifth District does extend into Dekalb County somewhat, an extension necessary to allow other precincts in the Atlanta area to be relocated in order to achieve vastly improved deviation, and also keep the City of Atlanta wholly within the Fifth District. The Court's splitting of Dekalb and other Atlanta area counties is consistent with the Georgia General Assembly's decision to split those counties due to the heavy population concentrations in that region of the state.
[6] A look at a map of the City of Marietta and Cobb County reveals that every plan drawn at any level (county commission, state house, state senate, and congressional) must of necessity split some precincts in the Marietta-Cobb County area because of an annexation pattern that created noncontiguous enclaves and exclaves. There are pieces of the city that are islands in the county and vice versa. Def.Exh. 92.

In Clayton County, two precincts were split along already existing school board or county commission lines, and a third was split along a major geographical feature. These enabled the Court to achieve lower deviations in the Third and Fifth Districts without causing the problems discussed in footnote seven, infra.
[7] As we have noted:

[O]ne bad side effect of the splitting of units as small as precincts for racial purposes occurs when the precinct is divided in one way for a state house seat, another way for a state senate seat, and yet a different way for a congressional seat. When this kind of gerrymandering is repeated often enough, the voting combinations are so rare ... that a secret ballot becomes difficult for some voters.
Johnson III, at 1554 n. 3; Second Trl.Trans. at 28. The Court believes the same result could obtain from splitting precincts for any reason, not only racial. Thus, except in one instance, the Court avoided splitting precincts unless they were split in the same manner at other election levels, and then only where absolutely necessary. The new split precinct has its boundaries along easily identified major roadways.
[8] The correspondingly high number of counties in Georgia afforded the Court the same opportunity to maintain county boundaries (outside of metropolitan Atlanta counties) among the eleven congressional districts.
[9] The first 1992 plan gave us a clearer understanding of legislative intent, but it was not a perfect guide since it contained many of the same features in its Eleventh District that found their way into the unconstitutional Eleventh  connecting the south Dekalb County urban minority population with the primarily rural east Georgia minority population.
[10] Other factors the legislature has considered include avoiding contests between incumbents, drawing districts to include certain state political officers, and drawing districts so as to avoid having certain state officers represented by members of the opposite political party. Eleventh Trl. Trans. III at 21. Because these were not predominant factors the state has considered in the past, they were given less weight since they are inherently more political in nature than the more objective factors.
[11] As noted above, the large number of counties in Georgia affords a draftsman much flexibility in achieving near perfect deviation numbers while maintaining county boundary lines.
[12] Evidence showed that the significant population growth in Georgia is occurring in the metropolitan Atlanta area. Given the population density of those counties, it would be impossible to avoid splitting any counties.
[13] Since Dekalb County is a densely populated county in the Atlanta area, splitting it is acceptable under the one person-one vote principle. The legislature split it in the past to comply with that principle.
[14] See Part II(B)(2)(f)(1)(iii) (discussing the importance of maintaining black percentage of registered voters as close to fifty-five percent as possible). With the exception of four Dekalb precincts moved to the Fifth District, the rest of the Dekalb precincts were part of the Fifth in the 1982 plan and remain in the Fifth under our plan.
[15] There are heavy minority concentrations in south Dekalb and Fulton counties, east central Georgia (most of which is in the new Eleventh District), southeast Georgia in the coastal region (all of which are included in the new First District), the southwest corner of Georgia, and a concentration in the west-central portion of the state. Pl.Exhs. 17-23, 36-40. Cf. Def.Exh. 17; U.S.Exhs. 8-16. The only way Georgia could draw a majority-minority district in the southwest corner of the state was to use "narrow land bridges ... and ... a number of irregular appendages." Johnson III, at 1554. The only way Georgia could create a majority-minority district out of the minority concentrations in east-central Georgia was to link that rural minority population, again using land bridges and appendages, to the large urban minority population in south Dekalb County. See 1992 Plan. We will not repeat the same mistake.
[16] Georgia could consider race as a predominant factor in redistricting if such a consideration was necessary to meet strict scrutiny. Johnson II, at ___, 115 S.Ct. at 2481, 132 L.Ed.2d at 782. We cannot subvert Georgia's traditional districting principles in order to draw a second majority-minority district. If Georgia had a concentrated minority population large enough to create a second majority-minority district without subverting traditional districting principles, the Court would have included one since Georgia's legislature probably would have done so. The VRA does not require proportional representation, however. See, e.g., White v. Regester, 412 U.S. 755, 765-66, 93 S.Ct. 2332, 2339-40, 37 L.Ed.2d 314 (1973); Whitcomb v. Chavis, 403 U.S. 124, 148-56, 91 S.Ct. 1858, 1871-76, 29 L.Ed.2d 363 (1971). As the Supreme Court stated in Shaw v. Reno:

The principle of equality is at war with the notion that District A must be represented by a Negro, as it is with the notion that District B must be represented by a Caucasian, District C by a Jew, District D by a Catholic, and so on.... That system, by whatever name it is called, is a divisive force in the community, emphasizing differences between candidates and voters that are irrelevant in the constitutional sense.
509 U.S. 630, 648, 113 S.Ct. 2816, 2827, 125 L.Ed.2d 511, 529 (1993) (quoting Justice Douglas' dissent in Wright v. Rockefeller, 376 U.S. 52, 66-67, 84 S.Ct. 603, 610-11, 11 L.Ed.2d 512 (1964)).
At the remedy phase of the October, 1995 hearing, the counsel for the Speaker of Georgia's House of Representatives observed that if the Court did include a second majority-minority district, it would be "set in stone." He contended that, since future plans would be measured against the Court's plan for purposes of VRA analysis, Georgia's legislature would be hamstrung to relocate the district elsewhere, or to alter the mix of counties included within the district, for fear of violating the VRA. Counsel for Amicus Curiae agreed, which is significant since the Amicus plan contains two majority-minority districts. Cf. Johnson I, 864 F.Supp. at 1386 (noting problems a plan attempting to give minorities proportional representation could present in drafting future plans to satisfy VRA). Since political considerations pervade the redistricting task, the Court feels that any permanent footprint left on Georgia's political landscape, especially one with such dangerous side effects as the Supreme Court has noted, should be left to those elected to make such decisions. In other words, we feel the need to intrude as little as possible in this inherently political territory.
[17] In its response to the Court's request for additional demographic information concerning minority population trends in Dekalb County, the State Defendants produced an affidavit of Linda Meggers. Ms. Meggers attests that while in 1990 27.4% of Dekalb County's registered voters were black, that number had increased to 35.7% by 1994. Meggers' 11/21/95 Aff. ¶ 7. She indicated the number could be as high as 39.4% in 1995, but that that number is due to a new voter registration law more than population shifts. Id. at ¶¶ 7-9. In any event, while the Court is bound to use 1990 census figures in formulating a remedy, we cannot ignore the strong trends in Dekalb County which indicate the remedy's Fourth District may be a stronger minority influence district than data based on the 1990 census would indicate.

The Abrams Intervenors do not dispute Meggers' figures; they only caution the Court that those figures must be viewed in light of the overall change in percentages for each district because some may have lost minority population. Their warning is duly noted.
[18] While we noted flaws in these analyses in Johnson I, these provide the most probative analyses we have which indicate what might be dilutive in the Fifth District. These statistics are based on statewide figures, though. The Court hesitates to rely on statistical data using percentages of black registered voters as its basis since that in essence condones voter apathy.
[19] We believe minority voting age population is the appropriate measure for dilution analysis. We offer minority population percentages strictly for comparison purposes since that is what the Busbee court focused on in essentially forcing Georgia to create a Fifth District in 1982 with a minority population of 65%.
[20] Debate arose at the August, 1995 hearing and the October, 1995 trial as to whether the current plan or the 1982 plan is the appropriate benchmark for retrogression analysis. Interestingly, the DOJ asserted that the unconstitutional plan should be used, contravening 28 C.F.R. § 51.54(b)(1) which dictates using the last constitutional plan on the ground if the current plan is unconstitutional. Since the Court is in the position of replicating the legislative task as it existed in 1992, the 1982 plan should serve as a guide. Of course, since the Court's plan is not subject to Section 5 preclearance, the point is academic.
[21] Some members of the General Assembly did present plans to the Court, but none purported to be the actual product of the General Assembly. Nevertheless we considered them along with the other plans presented to us during this process.
[*] Editor's Note: Best Photo available for purposes of publication.